CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

AUG 0 7 2012

JULIA C DUDLEY, CLERK
BY:
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

SPRINT COMMUNICATIONS          )
COMPANY, L.P.,                 )
                               )
        Plaintiff,             )          Civil Action No. 5:11cv00082
                               )
v.                             )
                               )
NTELOS TELEPHONE INC.,         )          By:    Michael F. Urbanski
                               )                 United States District Judge
        Defendant.             )
                               )

## AMENDED MEMORANDUM OPINION

This matter is before the court on cross motions for summary judgment filed by plaintiff

Sprint Communications Company, L.P., ("Sprint") and defendant Ntelos Telephone Inc.

("NTELOS") (Dkt. # 50 & 57), and NTELOS' motion to stay and refer the case to the Federal

Communications Commission ("FCC") (Dkt. # 64). The parties have briefed the issues, and oral

argument was held on March 2, 2012. For the reasons set forth below, the cross motions for

summary judgment are **DENIED** and NTELOS' motion to stay and refer this matter to the FCC

is **GRANTED**.

### I.

Since at least 2002, Sprint, a long distance telephone carrier,[1] has used the local

telephone services provided by NTELOS, a local exchange carrier ("LEC"), for long distance

calls originating and terminating in the NTELOS service area in the Western District of Virginia.

Sprint contends that it was overcharged for local telephone services provided by NTELOS and

---

[1] As such carriers transmit long distance calls between local telephone exchanges, they are referred to as interexchange carriers ("IXCs").

seeks a refund of more than $3.9 million for service between July 21, 2007 and October 31, 2009.

Telecommunications carriers, such as NTELOS, file tariffs which, upon FCC approval, govern their rate structure and establish procedures for ordering a carrier's service. See MCI Telecomm. Corp. v. Dominion Commc'n Corp., 984 F. Supp. 185, 187 (S.D.N.Y. 1997). Tariffs have been defined as "essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." Cahnmann v. Sprint Corp., 133 F.3d 484, 487 (7th Cir. 1998). On September 18, 2002, NTELOS concurred in the ICORE, Inc. Tariff F.C.C. No. 2 ("ICORE Tariff") filed with the FCC for the provision and billing of its services. Sprint alleges that from the time of NTELOS' concurrence in the ICORE Tariff until November 2009, NTELOS billed Sprint, and Sprint paid NTELOS, for local telephone services at a rate in excess of that authorized by the ICORE Tariff.[2] For the purposes of this motion, Sprint concedes that from 2002 to October 31, 2009, it ordered, was billed and paid for local access services on a per minute per mile basis referred to as Tandem Switched Transport ("TST").[3] Sprint now asserts that the ICORE Tariff precludes billing at TST rates and requires that it be charged a lower, flat rate for dedicated service referred to as Direct Trunked Transport ("DTT"). Sprint argues that the plain language of the ICORE Tariff and application of the filed rate doctrine[4] require the

---

[2] Sprint claims that NTELOS overbilled Sprint for local access services from the time the ICORE Tariff was adopted by NTELOS in 2002 until October 31, 2009, but recognizes that its claim for refund of overpayments is limited to overcharges assessed within two years of filing this action.

[3] On brief and at oral argument, Sprint disputed NTELOS' assertion that it only ordered local access services on a TST basis. For the purposes of this motion and its argument concerning the filed rate doctrine, Sprint has taken the position that how it ordered local access services is irrelevant under the filed rate doctrine. The court's opinion reflects the issue as framed by the parties for the purposes of this motion only, and does not represent a factual finding by the court as to what services Sprint actually ordered.

[4] "The filed rate doctrine provides that tariffs filed with the [Interstate Commerce Commission] are lawful for all purposes and binding with the force of law unless the [Interstate Commerce Commission] declares the tariff to be unlawful or unreasonable." Beach v. Atlas Van Lines, Inc., Nos. 2:07-764-CWH, 2:07-2861-CWH, 2008 WL 8602539, at *3 (D.S.C. Mar. 31, 2008); see In re Carolina Motor Express, Inc., 949 F.2d 107, 109 (4th Cir. 1991)

court to grant its motion for summary judgment and award it damages. NTELOS counters that

Sprint's claim is barred by NTELOS' 2003 Chapter 11 bankruptcy or, alternatively, should be

stayed and referred to the FCC under the doctrine of primary jurisdiction. As to the merits of

Sprint's claim, NTELOS contends that Sprint was billed and paid for the local telephone services

it ordered, and that Sprint is obligated to pay for those services.

## II.

NTELOS moves for summary judgment, arguing any claim Sprint had related to

NTELOS' billing practices following adoption of the ICORE Tariff was discharged in NTELOS'

2003 Chapter 11 bankruptcy proceeding. NTELOS asserts that Sprint's allegations in this case

stem from NTELOS' failure to switch to DTT billing upon adoption of the tariff on September

18, 2002.[5] According to NTELOS, this failure, which occurred prior to the filing of NTELOS'

bankruptcy petition on March 4, 2003, gave rise to Sprint's claim, or right of payment, in

bankruptcy. However, Sprint failed to assert any such claim in NTELOS' bankruptcy

proceeding, despite having received written notice of the filing of the bankruptcy petition. Thus,

NTELOS argues, any claim Sprint had was discharged by virtue of the confirmation of the

Chapter 11 reorganization plan in August 2003 and Sprint's cause of action fails as a matter of

law.[6]

---

(citing Louisville & Nashville R.R. Co. v. Maxwell, 237 U.S. 94, 97 (1915)), rev'd on other grounds sub nom.
Reiter v. Cooper, 507 U.S. 258 (1993); see also Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 222
(1998) (applying the "century-old 'filed rate doctrine' associated with the [Interstate Commerce Act] tariff
provisions" to the Communications Act).

[5] With respect only to this motion, NTELOS does not contest Sprint's legal theory. See NTELOS' Mem. In
Support of Mot. for Summ. J., Dkt. # 51, at 2 n.1. Thus, the court will accept Sprint's allegations as true for
purposes of this analysis.

[6] Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there
is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When
making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact

3

For its part, Sprint argues that the relevant conduct is not NTELOS' adoption of the ICORE Tariff but rather NTELOS' repeated billing for local telephone services at a rate in excess of that authorized by the ICORE Tariff. Sprint views each bill containing an overcharge as a separate, actionable violation of the tariff, and therefore, a separate claim. In its Second Amended Complaint, Sprint asserts it is entitled to a refund for overpayments made from July 21, 2007 through October 31, 2009, well after NTELOS filed its bankruptcy petition and the reorganization plan was confirmed by the bankruptcy court. Sprint argues these post-bankruptcy claims survive, regardless of how similar they are to pre-bankruptcy claims that may have been discharged. To hold otherwise, Sprint asserts, would be to give NTELOS a license to continue to violate the law long after its bankruptcy proceedings concluded, which defies both legal precedent and common sense.

## A.

Under the Bankruptcy Code, the confirmation of a reorganization plan discharges the debtor from any debt arising before the date of confirmation. 11 U.S.C. § 1141(d)(1)(A). A "debt" is defined as a "liability on a claim," 11 U.S.C. § 101(12), and a "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. . . ." 11 U.S.C. § 101(5)(A). Congress intended this definition to be "as broad as possible, noting that 'the bill contemplates that all legal obligations of the debtor, no matter how

---

is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient." Nguyen, 44 F.3d at 237 (quoting Straw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)).

4

remote or contingent, will be able to be dealt with in the bankruptcy. It permits the broadest possible relief in the bankruptcy court.'" Grady v. A.H. Robins Co., Inc., 839 F.2d 198, 200 (4th Cir.) (citing legislative history of 11 U.S.C. § 101(4), which formerly defined the term "claim," now codified in § 101(5)), cert. denied, 109 S. Ct. 201 (1988).

In Grady, the Fourth Circuit addressed the issue of when a claim arises for purposes of bankruptcy. Grady filed a tort action on October 15, 1985, alleging she was injured by an interuterine contraceptive device, the Dalkon Shield, manufactured and marketed by defendant. Id. at 199. Defendant had filed for Chapter 11 bankruptcy a few months earlier, on August 21, 1985. Grady asked the court to find that her claim did not arise prior to the filing of the bankruptcy petition and was therefore not subject to the automatic stay. Id.; see 11 U.S.C. § 362(a)(1). Relying on the relevant state law, Grady argued that her cause of action did not accrue until she was injured, and because she was injured after the petition was filed, the automatic stay provision in § 362 did not bar her suit from prosecution. She relied on Matter of M. Frenville Co., Inc., 744 F.2d 332 (3d Cir. 1984), in which the Third Circuit held that a right to payment must exist prior to the filing of a bankruptcy petition in order for a claim to exist and that courts must look to state law to determine when such a right to payment arises. Grady, 839 F.2d at 200.

The Fourth Circuit rejected plaintiff's argument and the Third Circuit's holding in Frenville.[7] 839 F.2d at 201-02. The court held that "the bankruptcy Code is superimposed upon the law of the State," and courts should look to the Bankruptcy Code, rather than state law, to

---

[7]  In addition to the Fourth Circuit, the Frenville approach has been "universally rejected" by its sister circuits. In re Andrews, 239 F.3d 708, 710 n.7 (5th Cir. 2001); see, e.g., In re Parker, 313 F.3d 1267, 1269 (10th Cir. 2002); In re Jastrem, 253 F.3d 438, 442 (9th Cir. 2001); Epstein v. Official Comm. of Unsecured Creditors, 58 F.3d 1573, 1576 n.2 (11th Cir. 1995). Indeed, Frenville was later overruled by the Third Circuit in the case of In re Grossman's Inc., 607 F.3d 114 (3d Cir. 2010).

determine when a claim arises. Id. at 202. With respect to the definition of "claim" in the

Bankruptcy Code, the court found that Congress contemplated "the broadest possible relief,"

intending "that all legal obligations of the debtor, no matter how remote or contingent, will be

able to be dealt with in bankruptcy." Id. The Fourth Circuit went on to hold:

> We do not believe that there must be a right to the immediate
> payment of money in the case of a tort or allied breach of warranty
> or like claim, as present here, when the acts constituting the tort or
> breach of warranty have occurred prior to the filing of the petition,
> to constitute a claim under § 362(a)(1). . . . Congress has created a
> contingent right to payment as it has the power to create a
> contingent tort or like claim within the protection of § 362(a)(1).
> We are of opinion that it has done so.

Id. at 203. Thus, the court found that Grady's claim arose at the time the Dalkon Shield was

inserted, which occurred prior to the filing of the bankruptcy petition, and that Grady's claim

was therefore subject to the automatic stay. The analysis used by the Fourth Circuit in Grady to

determine when a bankruptcy claim arises is known as the "conduct test."

Although the Grady court expressly limited its holding to the context of the automatic

stay,[8] the Fourth Circuit applied the same reasoning and holding in Holcombe v. U.S. Airways,

Inc., 369 F. App'x 424, cert. denied, 131 S. Ct. 343 (2010), a case brought under the Americans

with Disabilities Act, in which the court considered whether plaintiff's discrimination claim had

been discharged in bankruptcy. In Holcombe, plaintiff alleged that she was denied

accommodations for her medical condition beginning January 2002, and she filed grievances as a

result in February and March 2002. Id. at 426. On August 11, 2002, U.S. Airways and its

affiliates filed for relief under Chapter 11 of the Bankruptcy Code. Id. at 427. A reorganization

---

[8] "We emphasize, as did the district court, that we do not decide whether or not Mrs. Grady's claim or those of the
Future Tort Claimants are dischargeable in this case. . . . We hold only that the Dalkon Shield claim in the case
before us, when the Dalkon Shield was inserted in the claimant prior to the time of filing of the petition, constitutes a
'claim' 'that arose before the commencement of the case' within the meaning of 11 U.S.C. § 362(a)(1)." Grady, 839
F.3d at 203.

6

plan was confirmed on March 18, 2003. Holcombe filed suit in September 2003. One year later, U.S. Airways filed a second petition for bankruptcy relief under Chapter 11. Although Holcombe did not file a proof of claim in the first bankruptcy case, she did file a proof of claim in the second case. U.S. Airways objected to the claim and moved for summary judgment. The bankruptcy court granted the motion, finding plaintiff's claim was barred by the discharge in the first bankruptcy case. The district court affirmed. Id.

On appeal, the Fourth Circuit held that Holcombe had a claim as of March 18, 2003 and that her claim was properly discharged as of that date. Id. at 427-28. Employing the conduct test set forth in Grady, the court found that all of the important events giving rise to Holcombe's reasonable accommodation claim occurred prior to the confirmation of the reorganization plan. 369 F. App'x at 428. The court rejected Holcombe's argument that her claim is a "continuing violation," one that "accrued pre-confirmation and has persisted into the post-confirmation period." Id. at 429. Importantly for purposes of the instant case, it held that while her claim as to pre-confirmation discriminatory actions did not survive the 2003 discharge, any claims arising from allegedly discriminatory acts committed by defendant post-confirmation were not discharged and remained open for adjudication.[9] Id. at 428, 429.

With this framework in mind, the court turns to the issue of whether Sprint has a claim that arose prior to the confirmation of the Chapter 11 reorganization plan and was therefore discharged in bankruptcy.

---

[9] Because Grady dealt solely with the applicability of the automatic stay, the relevant date for determining whether a claim existed was the date of the bankruptcy petition. In Holcombe, the issue was dischargeability, so the relevant date was the date of the confirmation of the reorganization plan. Indeed, the Bankruptcy Code specifies that the confirmation date is the relevant date for determining whether a claim has been discharged. 11 U.S.C. § 1141(d)(1)(A). In the instant case, the allegations raised in the Second Amended Complaint stem from overcharges assessed between 2007 and 2009, well after both the bankruptcy petition was filed and the reorganization plan confirmed.

7

**B.**

Pursuant to the Fourth Circuit's conduct test, a claim arises when the conduct giving rise to the alleged liability occurred.[10] Concord West of the Ashley Homeowners' Ass'n v. J.A. Jones, Inc., No. 3:09-cv-00182-GCM, 2010 WL 148432, at *1 (W.D.N.C. Jan. 12, 2010) (quoting In re Piper Aircraft Corp., 58 F.3d 1573, 1577 (11th Cir. 1995) (citing Grady, 839 F.2d at 199)). In order to determine whether Sprint's claim arose pre- or post-bankruptcy, the court must determine what conduct gave rise to NTELOS' liability.

The Communications Act requires NTELOS to file with the FCC and keep open for public inspection "schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication[s]," which are known as tariffs. 47 U.S.C. § 203(a). NTELOS is liable if it charges, demands, collects or receives a "greater or less or different compensation" than that set forth in the applicable tariff on file. 47 U.S.C. § 203(c). On September 18, 2002, NTELOS concurred in the ICORE Tariff, which, according to Sprint, provides only for billing at flat DTT rates. Pl.'s Second Am. Compl., Dkt. # 67, at ¶¶ 11, 15, 17, 27. Sprint alleges that between 2002 and 2009 NTELOS billed Sprint at higher, usage-based TST rates in violation of the ICORE Tariff, Section 6.1.3(A)(2). Pl.'s Second Am. Compl., Dkt. # 67, at ¶¶ 16, 26, 28-30. Sprint asserts that this billing practice has resulted in monthly overcharges, and each of these overcharges gives rise to a separate claim against NTELOS. While claims to overcharges assessed prior to confirmation of the reorganization plan may have

---

[10] Having rejected the "accrual test" articulated in Frenville, most circuits have adopted either the conduct test or what has been referred to as the "prepetition relationship test." See, e.g., In re Piper Aircraft Corp., 58 F.3d 1573 (11th Cir. 1995) (adopting a slightly modified version of the prepetition relationship test). The court notes that at least one district court within the Fourth Circuit has applied what appears to be a "joint prepetition relationship and conduct test regime," finding the prepetition test to be a threshold inquiry that allows for analysis under the conduct test. Concord West of the Ashley Homeowner's Ass'n v. J.A. Jones, Inc., No. 3:09-cv-00182-GCM, 2010 WL 148432, at *2-3, 3 n.3 (W.D.N.C. Jan. 12, 2010). In the instant case, the court need not decide whether to apply a strict conduct test or a hybrid prepetition relationship / conduct test as did the court in Concord West. Sprint and NTELOS plainly had a prepetition relationship. See Pl.'s Second Am. Compl., Dkt. # 67, at ¶ 24. Thus, the court's analysis will focus solely on the conduct test.

been discharged (and certain others perhaps barred by the statute of limitations, see note 2, supra), Sprint asserts its claims to refunds for the nearly $4 million in overpayments made between July 21, 2007 and October 31, 2009 survive bankruptcy. The court agrees.

The Bankruptcy Code defines a "claim" as a "right to payment." 11 U.S.C. § 101(5)(A). Sprint has no right to payment unless and until it is overcharged by NTELOS in violation of the applicable tariff. Until Sprint receives a bill from NTELOS, it does not know whether it has been charged correctly or incorrectly under the tariff. Sprint's right to repayment for overcharges assessed by NTELOS between July 2007 and October 2009 arose at the time Sprint was billed for services rendered during that period.

NTELOS argues Sprint knew or should have known as early as 2002 that NTELOS was billing Sprint incorrectly and that the conduct would continue. NTELOS contends that its conduct should have been foreseeable, suggesting the claims were part of a continuing course of conduct dating back pre-bankruptcy to 2002, when it first failed to switch Sprint to DTT rates after adoption of the ICORE Tariff, and continuing through 2009. Similar arguments were made and rejected in both Holcombe and O'Loghlin v. County of Orange. Holcombe, 369 F. App'x at 428 n.2, 429 (rejecting Holcombe's theory that her ADA claim was a single, unitary "continuing violation" claim that accrued pre-confirmation and persisted into the post-confirmation period); O'Loghlin v. Cnty. of Orange, 229 F.3d 871, 874-75 (9th Cir. 2000) (reversing district court's holding that second and third denials of accommodation were "inevitable consequence" of the first denial, rather than actionable continuing violations of the ADA, and holding county liable for post-discharge conduct that violated the statute).

Even if Sprint should have known in 2002 that NTELOS was billing incorrectly, it does not change the fact that, under the Bankruptcy Code, Sprint has a separate right to payment every

9

time NTELOS bills Sprint in contravention of the tariff. The fact that Sprint did not notice it was being overcharged until 2009 is inapposite for purposes of this analysis.[11]

 While the court recognizes that questions of when a cause of action accrues for purposes of bankruptcy and when the statute of limitations begins to run are "two separate and distinct issues aimed at very different problems," In re Swift, 129 F.3d 792, 796 (5th Cir. 1997), it is worth examining how courts and regulatory agencies have treated the issue of overcharges in the statute of limitations context. In determining when a statute of limitations begins, courts have treated the duty to make monthly payments for telecommunications services like an installment contract and held that a separate cause of action arises on the date each payment is missed, even if those installments stem from a services agreement between the parties. See MFS Int'l, Inc. v. Int'l Telcom Ltd., 50 F. Supp. 2d 517, 524-25 (E.D. Va. 1999) (citing MCI Telecomm. Corp. v. Teleconcepts, Inc., 71 F.3d 1086 (3d Cir. 1995)). The FCC took a similar approach to a case involving overcharges, Tele-Valuation, Inc. v. American Telephone & Telegraph Co., 73 F.C.C.2d 450 (1979). In Tele-Valuation, plaintiff was hired as a telecommunications consultant by Wilson Freight Co. In the course of that employment, Tele-Valuation uncovered mistakes in

---

[11] Any seeming injustice that may result from allowing Sprint to proceed with this cause of action after failing to notice these monthly overcharges for seven years is offset by the fact that, at best, Sprint will only be able to recover damages stemming from overcharges assessed between July 2007 and October 2009, as any claims it has to refunds for overpayments made after confirmation of the reorganization plan but prior to 2007 are barred by the statute of limitations. The FCC aptly noted in Tele-Valuation, Inc. v. Am. Tel. & Tel. Co., 73 F.C.C.2d 450, 452 (1979), that at the point a customer receives its bill for services, the customer:

> may review the charges, compare them with the appropriate tariffs, question the carrier, or take any other steps necessary to detect and remedy errors. This places a burden of prompt detection of overcharges on the party with the greatest incentive to do so and penalizes dilatory detection, thereby guarding against later attempts to recover for stale claims. Through the exercise of diligence the customer may prevent loss; he therefore is held knowledgeable at the time he is notified of his charges.

Sprint's failure to carefully inspect its bills limits its damages claim in this case to just over two years of overcharges.

10

the bills it received from AT&T for its leased private line network, some of which dated back over a decade. AT&T refunded only $3,000 of the $17,700 Tele-Valuation claimed was owed, arguing the remaining claims had been extinguished as a matter of law by the running of the statute of limitations as set forth in 47 U.S.C. § 415(c). Id. The FCC held that while the Communications Act itself does not define the point of accrual of a cause of action:

> [I]n the analogous case of an action for damages, the point has been determined to be when the carrier does the unlawful act or fails to do what is required. We believe the same rationale governs in the case of overcharges and that, as a general proposition, the point of accrual should be fixed as the time the customer receives a bill for services.

Id. at 452. Thus, the FCC found that the statute of limitations in effect at the time each particular bill was rendered governed plaintiff's claims. Id. at 453.

Although the statute of limitations issue is distinct from the one currently before the court—namely, when Sprint's claims accrued for purposes of bankruptcy—the answer to both questions happens to be the same in this case. The court finds no reason to treat overcharges differently for purposes of this analysis. Sprint's right to payment, its claim as defined in the Bankruptcy Code, arose each time it was billed for services rendered at a rate in contravention of the tariff and in violation of 47 U.S.C. § 203(c). Those claims that arose pre-bankruptcy have been discharged; those that arose post-bankruptcy remain viable.

NTELOS argues that the act giving rise to its liability was not the rendering of the bill but the failure to switch Sprint to DTT billing upon adoption of the ICORE Tariff in 2002— an act which undoubtedly occurred pre-bankruptcy. NTELOS points to the expansive definition of "claim" in the Bankruptcy Code and to the court's holding in Grady that the first conduct giving rise to a claim establishes whether it arose pre- or post-petition, irrespective of any post-petition injuries that might stem from that conduct. NTELOS' theory of the case is that its failure to

11

switch Sprint to DTT billing in 2002 is the first conduct and the resulting monthly overcharges are simply the injuries stemming from that conduct.

Despite NTELOS' reliance on <u>Grady</u>, the instant case is factually distinguishable. <u>Grady</u> involved a tort claim, and it was clear that the act giving rise to liability—the insertion of the Dalkon Shield—occurred pre-petition. The issue in <u>Grady</u> was, in fact, whether plaintiff's claim for purposes of bankruptcy arose when the act giving rise to liability was performed or whether it arose when the harm caused by those acts manifested. Grady argued she could not have sued defendant until she knew the nature of her injuries, because the relevant state law held a cause of action did not accrue until that point. 839 F.2d at 201 n.4. The Fourth Circuit rejected that argument, holding the Bankruptcy Code, rather than state law, dictates when a claim arises.

Here, the issue in dispute is the actionable conduct itself—what gave rise to NTELOS' liability? The answer is NTELOS' billing at a rate different than that set forth in the tariff. <u>See</u> 47 U.S.C. § 203(c). NTELOS billed Sprint for services rendered at the TST rate, rather than the DTT rate Sprint asserts is required under the tariff, on a monthly basis between 2002 and 2009. The adoption of the ICORE Tariff did not trigger NTELOS' alleged liability; its failure to bill Sprint at a rate in accordance with that tariff did.

Unlike <u>Grady</u>, this is not a case where post-bankruptcy injuries naturally flowed from pre-bankruptcy conduct. Instead, separate violations of the Communications Act occurred both pre- and post-bankruptcy, giving rise to separate claims. As the case law makes clear, those claims stemming from post-bankruptcy violations survive, regardless of whether they are similar to the pre-bankruptcy claims. <u>See</u> <u>Holcombe</u>, 369 F. App'x at 428-29 (holding any allegedly discriminatory acts that occurred after the reorganization plan was confirmed were not discharged in bankruptcy and remained viable claims); <u>O'Loghlin</u>, 229 F.3d at 874-75 (holding

12

the county liable for post-discharge violations of the ADA despite the fact that similar pre-discharge violations were not viable).

Consider the case of In re Rosenfeld, 23 F.3d 833 (4th Cir.), cert. denied, 115 S. Ct. 200, reh'g denied, 115 S. Ct. 622 (1994). Rosenfeld acquired shares of River Place East Housing Corporation, a housing cooperative association, as well as a possessory interest in a River Place apartment, in 1983. Id. at 835. A covenant running with the land required owners to pay association dues; assessments were made annually and each owner was required to pay one-twelfth of his annual assessment each month of the fiscal year. Rosenfeld ceased paying his dues. He filed for Chapter 7 bankruptcy protection in October 1990 and in February 1991 was granted a discharge, which included $2,300 in pre-petition assessment of River Place dues. River Place then instituted a separate state court proceeding against Rosenfeld seeking dues from November 1, 1990 through April 30, 1992. Rosenfeld filed a motion for contempt in bankruptcy court, arguing his discharge extinguished any liability for both pre-petition and post-petition cooperative assessments. Id.

The bankruptcy court in Rosenfeld held that the act giving rise to River Place's right to payment was Rosenfeld's contract to purchase his cooperative interest in 1983. As such, the bankruptcy court considered the debt to be pre-petition and held it was discharged, even though some of the dues payments were not owed until the period following the filing of the petition. Id. at 836. The district court, however, reversed the decision of the bankruptcy court, finding the post-petition assessments were not discharged. The Fourth Circuit affirmed.

The Fourth Circuit recognized that "[t]he question of whether a bankruptcy discharge encompasses post-petition assessments has been addressed in the context of condominium association and homeowners' association dues with inconsistent results." Id. The Fourth Circuit

13

declined to follow a line of cases holding that an association's right to payment of dues arises

when the contract is made and is contingent on the debtor's continued ownership of the property.

Id. Instead, the Fourth Circuit, like the district court below, relied on a line of cases holding that

an association's claim for post-petition dues does not arise until the dues are assessed. Id. at 837.

The Fourth Circuit found that "Rosenfeld's obligation to pay the assessments arose from his

continued post-petition ownership of the property and not from a pre-petition contractual

obligation. . . .  River Place's right to payment for post-petition assessments did not arise pre-

petition and was not extinguished by Rosenfeld's bankruptcy discharge." Id. The Fourth Circuit

specifically noted that its holding in Grady did not require a contrary result:

> Mrs. Grady's claim alleged a tort and arose from the insertion of
> the Dalkon Shield, which occurred pre-petition.  River Place's
> claim is for assessments to cover expenses incurred during
> Rosenfeld's post-petition ownership of real property.  Grady deals
> with a claim arising from a pre-petition tort, while this case
> involves a breach of a covenant running with the land that occurred
> post-petition, and we find Grady is clearly distinguishable.

Id.

The district court in Zeitler v. Martel, 255 B.R. 172 (E.D.N.C. 1999), rejected an

argument similar to the one advanced by plaintiff in Rosenfeld.  The parties in Zeitler divorced

in 1983 and pursuant to the dissolution decree, Zeitler was obligated to pay Martel a portion of

his retirement benefits, which amount was due and payable at the time he began receiving such

benefits. Id. at 175.  Zeitler retired in 1993 and immediately began receiving benefits but did not

pay any portion of those benefits to Martel.  Martel learned of Zeitler's retirement in 1994 and

thereafter instituted state court proceedings as a result of Zeitler's failure to comply with the

dissolution decree. Id.  The matter was stayed, however, upon Zeitler's petition for bankruptcy

14

protection filed March 29, 1996. Id. at 175-76. Martel instituted an adversary proceeding in the bankruptcy case. Id. at 174.

The issue before the district court was whether the bankruptcy court erred in finding not dischargeable Martel's claims to post-petition retirement benefits Zeitler would receive in the future.[12] Id. at 176. Zeitler argued that the definition of "claim" pursuant to 11 U.S.C. § 101(5) was to be interpreted broadly in light of Grady and the Fourth Circuit's conduct test. Id. at 177. He asserted that his 1993 retirement and his subsequent failure to pay Martel were the relevant conduct, both of which occurred pre-petition. Id. The district court found this argument unpersuasive. It held that:

> The conduct necessary under Grady was appellant's failure to pay appellee upon receipt of his monthly pension payments. As to the payments yet to be received, they are claims to arise in the future at the time the payment is received by appellant and not paid to the appellee. The Bankruptcy Court, although not calling it such, correctly applied the "conduct test" to hold that appellee's claims on post-petition payments received by appellant and her claims on those payments to be received in the future are non-dischargeable.

Id. at 177-78.

Likewise, in the case of In re Camellia Food Stores, Inc., 287 B.R. 52 (E.D. Va. 2002), the court held that any claim for payment of additional—or refund of excess—monthly insurance premiums stemming from a 2001 insurance contract arose post-petition. In Camellia, the Pennsylvania Manufacturers' Association Insurance Company ("PMA") provided insurance to Camellia Food Stores for the years 1995-2001. Id. at 55. The policies expired at each year's end and had to be renewed. Estimated "deposit" premiums were paid to PMA on the first day of every month to cover that month's installment payment for insurance coverage, and PMA would

---

[12] The bankruptcy court found that Martel's claim to $18,000, representing her portion of the pre-petition retirement payments Zeitler received but did not pay her, was dischargeable. Martel did not appeal this decision. 255 B.R. at 177 n.1.

later calculate and adjust the amount of premiums owed. If Camellia had overpaid premiums for the year, PMA would owe Camellia a "return premium," and if Camellia underpaid, it would owe PMA an "additional premium." Id.

The parties entered into a worker's compensation insurance contract on December 28, 2000, and coverage began on January 1, 2001. Id. at 57. Four days later, on January 5, 2001, Camellia filed for Chapter 11 bankruptcy protection. Id. The question before the court was whether any claim concerning the 2001 insurance premiums arose pre-petition or post-petition. Citing the Fourth Circuit's decision in Grady, the court held that:

> [U]nder the conduct test, PMA's right of payment arises upon its offering continued insurance coverage to Camellia for 2001; quite simply, if PMA stopped covering Camellia's worker's compensation claims, Camellia would not need to pay PMA's premiums. Therefore, any claim PMA or Camellia possesses for the 2001 insurance premiums is a post-petition claim since such coverage occurred post-petition.[13]

Id. at 57-58 (internal citations omitted).

Rosenfeld, Zeitler and Camellia support the finding that Sprint's claims for overpayments did not arise until overcharges were assessed and overpayments made. Sprint's right to payment did not arise upon adoption of the ICORE Tariff in 2002, just as the right to payment in Rosenfeld did not stem from the 1983 purchase contract and the right to payment in Camellia did not stem from execution of the 2001 insurance contract. Likewise, Sprint's right to payment did not arise upon NTELOS' failure to switch to DTT billing after adopting the tariff in 2002, just as the court in Zeitler held that Martel's right to payment did not arise as of the date of Zeitler's retirement and his subsequent failure to pay Martel. Instead, the relevant conduct under Grady is

---

[13] The court held that the only exception to this finding would be the premium paid for the first four days of 2001, which likely arose pre-petition. However, because the parties presented no evidence as to the per-day amount of the 2001 premiums, the court had no choice but to include the premium paid for the first four days of 2001 with the rest of the 2001 premiums. 287 B.R. at 58-59.

NTELOS' monthly billing at rates exceeding those allowed by the ICORE Tariff for services rendered well after the bankruptcy concluded.

This holding is not inconsistent with the holdings in In re Leckie Smokeless Coal Company, 99 F.3d 573 (4th Cir. 1996) and In re Thompson, 182 B.R. 140 (E.D. Va. 1995), aff'd, 92 F.3d 1182 (4th Cir. 1996) (unpublished table decision), on which NTELOS relies. Applying the Grady conduct test, the courts in Leckie and Thompson found that the claims arose pre-petition; however, the relevant conduct in both of those cases is distinguishable from the conduct at issue here.

In Leckie, certain coal operators with liabilities under the Coal Act, the enactment of which created a Plan and Fund to provide benefits to retiring mine workers, filed petitions for bankruptcy and asked the bankruptcy court to declare that purchasers of their assets would not be liable as successors in interest for their financial obligations to the Plan and Fund. 99 F.3d at 575-76. The Plan and Fund argued that the court lacked subject matter jurisdiction over the matter because they did not have "claims" as defined in the Bankruptcy Code. Id. at 580. Specifically, they contended that since future premiums had not yet been assessed, the premiums did not exist, the Plan and Fund could not assert claims to the premiums, and the court could not issue orders for those premiums. The Fourth Circuit rejected this argument and held that the Plan and Fund indeed had claims in bankruptcy. Id. at 581. The court found that the enactment of the Coal Act gave rise to the coal operators' liability for future premiums, and that conduct occurred pre-petition. Id. at 580. Indeed, the coal operators' liability for future premiums was fixed at the time they filed their bankruptcy petitions; pursuant to the Coal Act, even if the operators had ceased mining operations to pursue an entirely different enterprise, they still would have been liable for future Coal Act premiums, simply by virtue of the passage of the Act. Id. at

581 n.9. As such, the relevant conduct in <u>Leckie</u> clearly differs from the relevant conduct in the instant case. NTELOS' liability was not fixed pre-petition as was the coal operators' in <u>Leckie</u>; rather, NTELOS' liability stems from each overcharge assessed against Sprint. Some of that allegedly erroneous billing occurred post-bankruptcy. Once NTELOS began billing at a rate that comported with the tariff, NTELOS' liability—and Sprint's right to payment—ceased.

The relevant conduct in <u>Thompson</u> is also distinguishable. In <u>Thompson</u>, the court held that a police officer's right to payment of retirement benefits, and the Retirement Board's right to collect overpayments made to the officer, both arose prior to the filing of the officer's Chapter 7 bankruptcy petition. Thompson joined the police force in 1969 and, after sustaining a work-related injury, began receiving disability benefits in 1973. 182 B.R. at 144. In 1987, Thompson pled guilty to a drug conspiracy, and the Retirement Board later determined that he had earned over $6 million in unreported income from these illegal activities between 1974 and 1986. <u>Id.</u> at 145. As such, the Board began to suspend its monthly disability payments to Thompson in order to collect the overpayments it made to him during that period. <u>Id.</u> at 146. When Thompson became eligible to receive regular retirement benefits on January 1, 1994, following 25 years of service to the police force, the Board sought to withhold these benefits as well. Thompson filed a petition for relief under Chapter 7 of the Bankruptcy Code on December 29, 1993 and commenced an adversary proceeding against the Board, arguing that any withholding of his disability and retirement benefits violated the automatic stay. The Board counterclaimed.

One issue before the court was whether the Board had a right to a set-off, which required a finding of "mutual claims that arose before the commencement of the bankruptcy case." <u>Id.</u> at 152. Having found the Board's right to collect overpayments from Thompson was indeed a "claim" as defined in the Bankruptcy Code, <u>id.</u> at 151, the court then determined that both the

18

Board's and Thompson's claims arose pre-petition. The court held that "[t]he Board's claim is based on the overpayments it made prepetition," id., and that "Thompson's right to payment for retirement benefits arose when he joined the police department in 1969, and thus became a participant in the plan." Id. at 153. The fact that Thompson had to obtain 25 years of service was merely a contingency. As such, the Board had a right to set-off. Id.

Much like in the instant case, the conduct relevant to the Board's claim in Thompson was its overpayment of benefits between 1974 and 1986. But unlike in the instant case, the entirety of those overpayments was made pre-petition. The relevant conduct giving rise to Thompson's claim also is distinguishable. Thompson's right to payment of benefits arose from his employment, which began in 1969. Here, by contrast, Sprint's right to repayment stems from overcharges assessed in violation of the tariff between 2007 and 2009, years after the bankruptcy concluded.

While the purpose of bankruptcy is to give the debtor a "fresh start," "[a] 'fresh start' means only that; it does not mean a continuing license to violate the law." O'Loghlin, 229 F.3d at 875. Because the overcharges alleged in Sprint's Second Amended Complaint were assessed by NTELOS post-bankruptcy, Sprint's claims were not discharged and its cause of action remains viable. As such, NTELOS' Motion for Summary Judgment (Dkt. # 50) will be **DENIED**.

### III.

NTELOS alternatively argues that this case should be stayed and referred to the FCC under the doctrine of primary jurisdiction. The doctrine of primary jurisdiction allows a court to stay or dismiss a case without prejudice to give the parties a reasonable opportunity to seek an administrative ruling on "some issue within the special competence of an administrative

19

agency." Reiter v. Cooper, 507 U.S. 258, 268 (1993). The doctrine "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." Nat'l Commc'ns Ass'n v. Am. Tel. & Tel. Co., 46 F.3d 220, 222-23 (2d Cir. 1995) (quoting Far East Conference v. United States, 342 U.S. 570, 574 (1952)). "Specifically, courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a particular agency." Id. (citing Goya Foods, Inc. v. Tropicana Prods., Inc., 846 F.2d 848, 851 (2d Cir. 1988)). "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996) (citing United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956)). By dividing decision-making authority, the doctrine serves to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." W. Pac., 352 U.S. at 63. It also serves judicial economy because the dispute may be decided by the administrative agency and obviates the need for court intervention. See Ryan v. Chemlawn Corp., 935 F.2d 129, 131 (7th Cir. 1991).

Although "'[n]o fixed formula exists for applying the doctrine of primary jurisdiction,'" Envtl. Tech. Council, 98 F.3d at 789 (quoting W. Pac., 352 U.S. at 64), courts frequently employ a four factor test, as follows:

> (1)    Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2)    Whether the question at issue is particularly within the agency's discretion;

20

>       (3)     Whether there exists a substantial danger of inconsistent
> rulings; and
>
>       (4)     Whether a prior application to the agency has been made.

Nat'l Commc'ns Ass'n, 46 F.3d at 222; Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va.,

759 F. Supp. 2d 772, 786 (E.D. Va. 2011).  The court must also balance the advantages of

applying the doctrine against the potential costs resulting from complications and delay in the

administrative proceedings.  Ricci v. Chi. Mercantile Exch., 409 U.S. 289, 321 (1973).

        NTELOS argues that this dispute properly should be resolved by the FCC lest the court

"become embroiled in the technical aspects" of tariff construction.  Access Telecomm. v. Sw.

Bell Tel. Co., 137 F.3d 605, 609 (8th Cir. 1998).  NTELOS points out that the ICORE Tariff is

more than 500 pages long and has over 400 sections, and is comprised of many industry terms

and acronyms that make it difficult to understand.  NTELOS contends that resolving this dispute

will require the court to construe various technical terms that have particular connotations and

meanings in the telecommunications industry, including whether Sprint properly ordered DTT

services under the terms of the ICORE Tariff, industry guidelines and standards.  NTELOS urges

the court to consider this issue against the backdrop of years of local transport restructuring by

the FCC and suggests that the FCC is in the best position to assess how the ICORE Tariff should

be interpreted in light of rulings involving other similar tariffs.

        NTELOS asserts that the definitional sections in the ICORE Tariff relied upon by Sprint

are identical to those found in another tariff used widely in the industry, the National Exchange

Carriers Association Tariff ("NECA Tariff"), yet Sprint's construction of the ICORE Tariff's

terms runs contrary to the way the same provisions of the NECA Tariff are interpreted

throughout the industry.  In particular, Sprint argues from §§ 2.6 and 6.1.3.(A)(2) & (3) that the

ICORE Tariff only permits NTELOS to charge a DTT rate for certain service segments. While the definitional test appears to support such a construction, the NECA Access Charge Handbook, pertaining to identical sections of the NECA Tariff, appears to support the contrary position, i.e., that an IXC such as Sprint can order and be provided switched access services by a LEC such as NTELOS on a TST basis. As a result, NTELOS argues that adoption of Sprint's position by the court would result in inconsistent applications of identical terms in the ICORE and NECA Tariffs, likely to cause widespread confusion across the industry.

Sprint argues that NTELOS has waived its primary jurisdiction argument by waiting so long to raise the issue in this case. Sprint posits that this case does not present any complicated or technical issues beyond the ken of the court and that this case may be decided based on the plain meaning of the ICORE Tariff under the filed rate doctrine. Sprint contends that the unambiguous terms of the ICORE Tariff do not allow NTELOS to charge Sprint for TST services for the segments at issue in this case regardless of what local access services were ordered by Sprint. Sprint argues that the filed rate doctrine, undeniably strict in application, does not allow NTELOS to charge Sprint a rate not spelled out in its filed tariff. Finally, Sprint argues that the interests of justice are not served by delaying this matter any further to allow the FCC to weigh in on the dispute.

On one hand, the core issue in this case seems relatively straightforward: Do the definitional sections of the ICORE Tariff allow NTELOS to charge the higher TST rates for Sprint calls traversing the segments of the NTELOS system at issue?[14] On its face, § 2.6 of the ICORE Tariff defines these segments as being DTT and § 6.1.3(A)(2) provides that a DTT rate applies for such a communications path. Consistently, § 6.1.3(A)(3) states that the TST rate

---

[14] Sprint identifies those segments as the segment from the Roanoke Serving Wire Center to the Waynesboro End Office and the segment from the Roanoke Serving Wire Center to the NTELOS Tandem.

Case 5:11-cv-00082-MFU   Document 90   Filed 08/07/12   Page 22 of 30   Pageid#: 1706

applies to a different communications path, that of the segment between the tandem and the end office. Because the DTT rate is the only rate that applies to the segments in question, Sprint argues that this case presents no technical or policy issues warranting a referral for a factual determination by the FCC.

On the other hand, many other provisions of the ICORE Tariff support NTELOS' argument that an IXC such as Sprint must specify and order the local access services it requires. The expert reports filed by NTELOS in opposition to the motion for summary judgment recount the regulatory history of Local Transport Restructuring overseen by the FCC over the past two decades. In his expert report, NTELOS expert Jeffrey W. Reynolds charts the FCC's involvement in this complicated and technical restructuring process back to 1992.[15] Reynolds states that the FCC clearly placed the responsibility for ordering Direct Trunked Transport services on IXCs, such as Sprint, while at the same time leaving them with the option of continuing to use Tandem Switched Transport service. Reynolds Report, Dkt. # 63-2, at ¶ 19. Reynolds notes that the FCC only allowed non-Tier 1 LECs, such as NTELOS, to file tariffs for DTT upon receipt of a bona fide request for DTT. Id. at ¶ 20. Sprint agrees, for the purposes of this motion only, that no such request was made by Sprint until November 2009.

The expert reports filed by NTELOS suggest that the switch from TST to DTT services was not a simple matter of just changing the rate as Sprint's motion proffers. Rather the services provided are inherently different. For example, NTELOS states that under TST, the local exchange carrier has the burden of ensuring that it has adequate capacity to handle the long

---

[15] Reynolds traces the FCC's oversight of this process back to its First Transport Order issued in 1992, which his Expert Report quotes as follows: "The rate structure and pricing of switched transport are the keystone of a regulatory structure designed to promote competition for interstate switched transport and interexchange service and to encourage efficient use of the access network, thereby promoting economic investment and innovation." Reynolds Report, Dkt. # 63-2, at ¶¶ 14, 15 (quoting In the Matter of Transport Rate Structure and Pricing, CC Docket No. 91-213, FCC 92-442, 7 FCC Rcd. 7006 (October 16, 1992)).

distance carrier's traffic, while under DTT the burden shifts to the long distance carrier to make sure it orders sufficient capacity to handle all of its traffic.

NTELOS explains further that the ICORE Tariff places the obligation on Sprint to tell NTELOS what services it wants to order. Chapter 5 of the ICORE Tariff, entitled Access Ordering, spans 27 pages and provides detailed ordering requirements. The local access services order form, termed an Access Service Request ("ASR"), provides for no less than 47 different valid configurations under which a customer may order switched access service. Without an order from Sprint, NTELOS asserts that it had no way to know which configuration Sprint sought and that the provision of DTT services without an ASR requesting the same was practically and technically impossible.

Both Sprint and NTELOS argue that a portion of § 5.2.1 of the ICORE Tariff, specifying the ordering requirements for switched access service, supports their position. Section 5.2.1 itself is seven pages long, and each party focuses on the first paragraph of this section, which states as follows:

> 5.2.1 Switched Access Service
>
> When ordering Switched Access service, the customer must specify the directionality of the service and whether the service is to be provided as (1) Direct Trunked Transport from the serving wire center to the end office or (2) Direct Trunked Transport from the serving wire center to a tandem which connects with Tandem Switched Transport from the tandem to the end office. When all or a portion of service is ordered as Direct Trunked Transport, the customer must specify the type and quantity of Direct Trunked Transport facility (e.g., Voice Grade, High Capacity DS1 or DS3, or Synchronous Optical Channel OC3 or OC12) and the hubs or ADM equipped wire centers involved.

Sprint argues that the first sentence of this section unambiguously supports its position that the ICORE Tariff only allows NTELOS to provide and charge Sprint for DTT services between the

24

serving wire center and the end office or tandem. To be sure, the fact that this sentence only mentions DTT services supports Sprint's construction. At the same time, however, this sentence does not clearly state that DTT service is the only type of service that could be provided. Other passages in § 5.2.1 appear to suggest that TST services can be ordered. For example, the very next sentence, which opens with the predicate that "[w]hen all or a portion of the service is ordered as Direct Trunked Transport," plainly suggests that a portion of the order can specify TST. TST is also mentioned on the next page of § 5.2.1, which provides "[w]hen a customer has both Tandem Switched Transport and Direct Trunked Transport at the same end office, the customer will be provided Alternate Traffic Routing as set forth in Section 6.4.6(C) following."[16]

Other sections of the ICORE Tariff make clear the obligation of the IXC to tell the LEC what services it wants in an ASR. For example, ICORE Tariff § 2.1.4 requires that the IXC provide reasonable notice of the services required. Section 5.1 states that "[t]he customer shall provide to the Telephone Company the order information required in Section 5.2," and § 6.1.2 provides that "Switched Access Service is ordered under the Access Order provisions set forth in Section 5.2." Further, § 6.1.3(A) of the ICORE Tariff requires the long distance carrier, when ordering DTT, to specify "the type of Direct Trunked Transport and whether it will overflow to Tandem Switched Transport when service is directly routed to an end office." These sections plainly place the burden on Sprint to order the services it needs and raise questions as to whether its "one rate fits all" argument squares with the all of the terms of the ICORE Tariff and the way the industry has operated under it and similar tariff provisions.

It is clear, therefore, that the ICORE Tariff required Sprint to order what local access services it wanted to purchase from NTELOS. Sprint argues that regardless of its obligation to

---

[16] The court appreciates that this sentence could be construed consistent with Sprint's argument, as it does not dispute that NTELOS' billing of TST services between the NTELOS tandem and the end office was correct. However, this sentence is not limited to that scenario and is, frankly, as clear as mud.

order, there was only one type of service that the ICORE Tariff allowed it to order and that the filed rate doctrine requires NTELOS to refund Sprint for monies paid in excess of the DTT rate.

The manner in which these two parties operated for seven years and other indicia of industry practice suggests otherwise. To be sure, the filed rate doctrine does not allow Sprint and NTELOS to agree to a rate other than that set forth in the tariff. See, e.g., Maislin Indus. U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990); D.S. Swain Gas Co., Inc. v. Dixie Pipeline Co., 911 F.2d 721, 1990 WL 112071, at *2 (4th Cir. 1990) (unpublished table opinion); MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc., No. Civ.A.04-1479, 2005 WL 2145499, at *3-5 (E.D. Va. Aug. 31, 2005). The purpose of the doctrine is to prevent price discrimination among customers. This case does not present circumstances, however, of the two parties acting in a manner to skirt the tariff to benefit one customer. Rather, the parties, acting at arm's length, operated for seven years with Sprint paying NTELOS the per-minute, per-mile rate for TST services. Given the large amount of money involved, the fact that Sprint was billed and paid for TST services for such a long period of time suggests that the issue is not as clear cut as Sprint contends. Were it as clear as Sprint maintains, one cannot help but wonder why it took Sprint so long to request a refund of the claimed overcharge.

In addition to the custom and practice of these two parties over the seven years between 2002 and 2009, NTELOS offers evidence that the custom and practice of the industry in general is consistent with its view that the ICORE Tariff allowed it to provide and bill Sprint for TST services. As detailed in the expert report of Gary M. Zingaretti, others in the industry have interpreted identical language in the widely used NECA Tariff to allow a long distance carrier to "use Tandem Switched Transport service as its primary form of transport in lieu of Direct Trunked Transport." See NECA Access Charge Handbook, § 6, at p. 6-5, attached as Ex. GMZ-

4 to Expert Report of Gary M. Zingaretti (Dkt. # 65-3). As Zingaretti explains, the NECA Access Charge Handbook provides guidance to more than 1,100 local exchanges subject to the NECA Tariff. NTELOS argues that Sprint's construction of the ICORE Tariff to require DTT services and rates is inconsistent with the way the industry has operated under identical provisions of the NECA Tariff. NTELOS highlights the risk of inconsistent applications of similar tariff language as a significant factor in justifying a reference to the FCC.

The court agrees. Indeed, application of the <u>National Communications</u> factors in this case supports a reference to the FCC. First, the court believes that the process and requirements for ordering switched access services involves technical considerations within the FCC's particular field of expertise. Over the past two decades, the FCC has been dealing with local transport restructuring and is well-equipped to assess the technical requirements of what Sprint ordered and what NTELOS provided and the ordering process by which those services were to be requested. The ordering strictures of the ICORE Tariff alone run 27 pages, and detailed technical issues concerning the requirements of the ordering process are best first directed to the FCC. Plainly, whether NTELOS was allowed to bill Sprint for TST services calls for the guidance of the FCC as to the operation of the FCC-approved ICORE Tariff in the regulatory framework constructed by the FCC for the provision of local access services. Second, this issue falls squarely within the FCC's discretion. Third, the court is particularly concerned by the fact that identical provisions of the NECA Tariff are interpreted by the industry in a manner different from that advocated by Sprint, thus raising the substantial danger of inconsistent rulings on identical provisions of parallel tariffs. The concern over inconsistent rulings compels the court to conclude that the expertise and knowledge of the FCC as to how the industry interprets similar tariff provisions and operates in practice is critical to the proper resolution of the present dispute.

27

Another substantial reason motivating the court to refer this matter to the FCC is the practical and technical impossibility argument raised by NTELOS. NTELOS argues that the ICORE Tariff requires it to provide services ordered by Sprint, and that it cannot read Sprint's mind and guess at the services to be provided. NTELOS' expert Reynolds states:

> Absent a valid ASR from Sprint for DTT billing NTELOS had no basis for switching Sprint to DTT and was unable to anticipate and provision the DTT network configuration and transport element Sprint desired. The presence of a valid and correct ASR has implications not only for access billing but also for the proper provisioning of the network facility to be utilized by an IXC. Without Sprint communicating the type of DTT billing arrangement, NTELOS has no way of knowing these parameters.

Reynolds Report, Dkt. # 63-2, at ¶ 25. This makes sense to the court as well. In short, this case turns on the technical considerations associated with the obligation of Sprint to order DTT services under the ICORE Tariff. Such "technical considerations are best resolved, in the first instance, by the FCC, the agency with both the expertise in these technical issues and the mandate to elucidate and implement the Act." Advamtel, LLC v. Sprint Commc'ns Co., L.P., 125 F. Supp. 2d 800, 805 (E.D. Va. 2001). Finally, the court does not believe the fact that this matter has not yet been presented to the FCC diminishes the benefit of obtaining the benefit of its knowledge and experience on this highly complex and technical issue.

The court frames the issue for reference as follows: Whether under the FCC regulatory framework, the terms of the ICORE and similar tariffs, and industry custom and practice, NTELOS was permitted to provide and charge Sprint for local access services at the Tandem Switched Transport rate during the 2007-09 period in question? To be sure, there is no formal referral mechanism by which a court can on its own authority demand or request a determination from an agency. Reiter v. Cooper, 507 U.S. 258, 268 n.3 (1993). Rather, the process is somewhat loose, resulting in a stay of these proceedings so as to give the parties an opportunity

28

within which to apply to the FCC for its views on the issue raised herein. Id. (citing United States v. W. Pac. R. Co., 352 U.S. 59, 64 (1956); Great Am. Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433 (1940); and Mitchell Coal & Coke Co. v. Pa. R. Co., 230 U.S. 247, 267 (1913)).

The court recognizes that a referral of this question to the FCC may result in some additional delay of this matter. Given how long it has taken Sprint to raise this issue, however, the court believes that any attendant delay will be more than offset by the technical knowledge and industry experience brought to bear by the FCC as to the factual issues concerning how the industry operates with regard to the ordering of switched access services and particularly with regard to whether the interpretation of the ICORE Tariff posed by Sprint comports with industry practice. To minimize the impact of this delay, however, the stay will be of limited duration. The case will be stayed for eight months only, until May 15, 2013. If, by that time, the FCC has not ruled on the issue referred to it, a trial addressing all remaining questions, including those referred to the FCC, will proceed in this court.

## IV.

For these reasons, NTELOS' motion for summary judgment (Dkt. # 50) is **DENIED** and its motion to stay and refer to the FCC (Dkt. # 64) is **GRANTED**. Because this matter will be referred to the FCC, the court need not consider the merits of Sprint's motion for summary judgment, and that motion (Dkt. # 57) will be **DENIED** at this time.

An appropriate Order will be entered.

Entered: August 6, 2012

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge